UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 6:15-CR-09-GFVT-HAI |
| | ) | |
| v. | ) | RECOMMENDED DISPOSITION |
| | ) | |
| | ) | |
| THOMAS HILL, | ) | |
| | ) | |
| Defendant. | ) | |

*** *** *** ***

Before the Court is a motion to suppress evidence based on an alleged violation of the defendant's right against self-incrimination. Defendant Thomas Hill is charged with conspiracy to distribute oxycodone. On February 5, 2014, a team of officers from various agencies executed a search warrant on his home. During the search, officers interviewed Hill in two bedrooms of his home during which he allegedly incriminated himself.

On August 31, 2015, Hill, through counsel, filed a motion to suppress and for a suppression hearing. D.E. 29. Hill asks the Court to suppress "his statement, pre-*Miranda* and post-*Miranda*, given to government agents on or about February 5, 2014, and any and all derivative evidence or fruits thereof."[1] D.E. 29-1 at 1; *see Miranda v. Arizona*, 384 U.S. 436 (1966). Hill argues that statements he allegedly made to Director Robbie Clark, Forest Service Special Agent Frank Antose, and DEA Special Agent Gregory Bunch were made while he was "being held in custody . . . and without consenting in writing to making a statement and without any *Miranda* warning." *Id*.

---

[1] Hill's reference to "pre-*Miranda* and post-*Miranda*" statements is odd because Hill's argument is that he received no *Miranda* warning. And nowhere does Hill argue his statements were involuntary even if given after a *Miranda* warning.

1

Hill's initial memorandum refers to a DEA-6 report the government submitted as an exhibit after the hearing. D.E. 29-1 at 1. The portions of the DEA-6 report that memorialize Hill's statements are heavily redacted, but the following paragraph, which describes the officers' "post Miranda interview of HILL," is relevant to this motion:

> On February 5, 2014, members of the [Lake Cumberland Area Drug Task Force ("LCADTF")] and the DEA London [Kentucky Regional Office] executed a state search warrant at the residence [of] Thomas HILL. While at the residence SA Bunch [and] Director Clark asked HILL to come into his bedroom. While in the bedroom SA Bunch read HILL his Miranda Warning via DEA 13a, as witnessed by Director Robbie Clark and SA Frank Antose. SA Bunch further told [HILL] he was not under arrest, he did not have to answer any questions if he did not want to and that he was not going to be arrested today, February 5, 2014. HILL waived his rights and agreed to talk.

D.E. 41-1 at 1.

Hill contends that, although Agent Bunch told him "he was not under arrest," Agent Bunch "prevented [Hill] from moving about his home." D.E. 29-1 at 2. Instead, agents "required [Hill] to stay in the bedroom" where they "interrogated" him. *Id*. Hill states he "does not recall" receiving a *Miranda* warning. *Id*. at 3. In other words, Hill claims he was subjected to a custodial interrogation without being informed of his *Miranda* rights.

In response, the government argues Hill was not in custody and that even if he was in custody, he voluntarily waived his *Miranda* rights. D.E. 35 at 3. According to the government's memorandum, while officers executed the search warrant, Agent Bunch told Hill "he was not under arrest, would not be arrested that day, and was not required to talk to law enforcement." *Id*. at 1-2. According to the government's version of events, Hill "led Agent Bunch to his bedroom" so they could talk "in private, away from his son and others present in the living room," where the conversation began. *Id*. at 2. According to the government, the bedroom was "a decidedly non-coercive location" and a "location of Hill's choosing." *Id*. at 4-5. According

2

to the government, Agent Bunch read the *Miranda* warnings to Hill, who waived his *Miranda* rights and "admitted to buying and selling large amounts of oxycodone" during the ensuing twenty- to thirty- minute discussion. *Id*. The government concludes that Hill "knowingly and voluntarily waived his *Miranda* rights by choosing to talk to Agent Bunch after being explicitly warned of his right not to do so." *Id*. at 9.

On September 16, 2015, this Court held a hearing on Hill's motion. D.E. 37. Hill testified on his own behalf, and the government called three law enforcement officers to testify. D.E. 36.

On September 28, Hill filed a supplemental post-hearing brief. D.E. 40. Hill structures his argument around four factors the Sixth Circuit used to determine whether a suspect was in custody in *United States v. Panak*, 552 F.3d 462 (6th Cir. 2009). He also asks the Court to credit his testimony that he did not recall any *Miranda* warnings. On October 5, the government filed its brief in response, arguing that Hill's testimony was not credible, that he was not in custody, and that he voluntarily waived his *Miranda* rights. D.E. 41.

For the reasons that follow, after thoroughly considering the entire record, the undersigned **RECOMMENDS** that the motion to suppress, D.E. 29, be **DENIED.**

### I. Legal Framework

As the Sixth Circuit explained in *Panak*,

> The Fifth Amendment says that an individual may not be "compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. To the ends of protecting that right, *Miranda* requires law-enforcement officers to give warnings . . . before interrogating individuals whom the officers have placed "in custody."

*United States v. Panak*, 552 F.3d 462, 465 (6th Cir. 2009) (quoting *Stansbury v. California*, 511 U.S. 318, 322-25 (1994)) (internal citations omitted). The *Miranda* warnings inform a suspect

"that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

> A threshold issue in *Miranda* cases is whether the suspect was "in custody:"
>
> In drawing the line between a non-custodial encounter between a citizen and the police (where *Miranda* does not apply) and a custodial encounter (where it does), courts consider "all of the circumstances" surrounding the encounter, with "the ultimate inquiry" turning on whether "a formal arrest" occurred or whether there was a "restraint on freedom of movement of the degree associated with a formal arrest." To answer this question, courts focus on the "objective circumstances of the interrogation" to determine "how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action."

*Panak*, 552 F.3d at 465 (quoting *Stansbury*, 511 U.S. at 322-25) (internal citations omitted).

Courts in this Circuit use a four-factor guide to determine whether an unarrested suspect may nevertheless be "in custody" for *Miranda* purposes: (1) the location of the interview; (2) the length and manner of questioning; (3) whether there was any restraint on the individual's freedom of movement during the interview; and (4) whether the individual was told that he or she did not need to answer the questions. *United States v. Hinojosa*, 606 F.3d 875, 883-84 (6th Cir. 2010) (applying the factors to an interview in the suspect's home); *Panak*, 552 F.3d at 465 (same). A police interview conducted at a suspect's home or workplace is highly unlikely to be found custodial. *See, e.g.*, *United States v. Solomon*, No. 6:13-cr-40-ART-5, 2015 WL 5474395, at *5 (E.D. Ky. Sept. 17, 2015) (finding no custody after applying *Panak* to an interview at the suspect's workplace); *United States v. Roberts*, No. 6:13-cr-48-GFVT-1, 2014 WL 2946650, at *3-6 (E.D. Ky. June 30, 2014) (interview on the suspect's front porch); *United States v. Gray*, No. 3:14-cr-04-GFVT, 2014 WL 2873931, at *3 (E.D. Ky. June 24, 2014) (interview in the suspect's living room); *United States v. Slone*, No. 7:12-cr-5-ART-4, 2013 WL 3799419, at *4-5

4

(E.D. Ky. July 19, 2013) (interview at the suspect's kitchen table); *United States v. Lockhart*, No. 7:12-cr-08-ART-2, 2013 WL 1412338, at *7 (E.D. Ky. Apr. 4, 2013) (interview at the suspect's workplace).

## II.  The Hearing

The person seeking to suppress evidence bears the initial burden of establishing he was in custody.  *United States v. Lawrence*, 1989 WL 153161, at *5 (6th Cir. Dec. 18, 1989).  Thus, at the September 16, 2015 hearing, Hill presented evidence first.

Hill testified that a total of ten to fifteen law enforcement officers searched his home on February 5, 2014.  It began when Detective Billy Correll knocked on Hill's door.  Hill met Officer Correll outside, where Officer Correll explained he had a search warrant and other officers would be arriving soon to search Hill's mobile home.  Hill and Officer Correll then went inside, into Hill's living room, while the other officers arrived.  Hill testified that his son Tyler, Tyler's girlfriend, and their two children were also in the house when the search began, but the officers allowed them to leave at Hill's request.

The next person who spoke to Hill was Robbie Clark, the Director of the LCADTF, who read the warrant to Hill.  According to Hill, an officer then took his wallet and told him to sit on the couch, where he remained for ten to fifteen minutes.

According to Hill, Agent Bunch then said he needed to talk and "took me in another room."  Hill said Agent Bunch "showed [him] which room to go to" and "escorted" him into the bedroom that was used by Hill's son.  Hill testified the officers did not touch him, but merely "pointed" toward the bedroom.  Hill said he did not remember asking the officers to move the conversation into the bedroom to prevent his family members from hearing it.  Hill explained that Agent Bunch, Director Clark, and another officer accompanied him to the bedroom.  Hill sat

5

at the foot of the bed while the officer he did not know "stood in the doorway." Hill testified he assumed the officer was trying to block the doorway and that he did not feel free to leave the room.

Hill testified that, during the conversation in Tyler's bedroom, Agent Bunch encouraged him to "get on the bus" early and "get a seat toward the front of the bus" by cooperating with the investigation. When asked about verbal threats, Hill said that Director Clark had threatened to seek federal—as opposed to state—charges against Hill's son if Hill failed to cooperate. Hill recalled Agent Bunch telling him that if he cooperated no one would be arrested that day. However, Hill also testified that he did not recall Agent Bunch telling him he was not under arrest.

Hill testified he had no recollection of having his *Miranda* rights read to him. On cross-examination, Hill testified that Agent Bunch "didn't read me my rights," and "I don't think he read them to me." Hill testified that officers never told him he *did not* have to answer their questions, but they also never told him he *did* have to answer questions.

Hill said he was in the bedroom for an hour to an hour and a half, or an hour and a half to two hours, and he was never left unattended. According to Hill, the statements that are ascribed to him in the DEA-6 report were actually statements Agent Bunch read to Hill, hoping Hill would confirm the information. Hill testified that he never admitted to the officers that he trafficked drugs, but that he did not go out of his way to deny their accusations, either.

When it came time to search Tyler's bedroom, Hill explained that he and the officers moved to another bedroom across the hall. Again, Hill said, an officer always stood between him and the doorway. Hill testified that the door remained opened most of the time in both bedrooms. Hill testified that no officers drew their guns during the visit.

6

Hill also described how after the search of his home he accompanied several of the officers to a bar he owned in Tennessee, where he gave them consent to search. Hill drove his own vehicle to the bar, and drove himself home after the bar was searched.

After Hill's testimony, the government called three witnesses. The first was Detective Billy Correll of the Kentucky State Police. Detective Correll testified that he and Hill knew each other before the search. Detective Correll said he went to Hill's house in an unmarked Taurus and out of uniform. He testified the whole search took about two hours, and that he did not go into either bedroom with Hill.

The second government witness was Special Agent Gregory Bunch—the DEA's case agent for the investigation. Agent Bunch testified that the search of Hill's home began around 10:00 a.m., and involved ten to fifteen officers, including the McCreary County Sheriff. There were no lights or sirens activated, and no guns drawn.

When asked who made the decision to go to Tyler's bedroom, Agent Bunch said he could not remember. Agent Bunch testified that he asked Hill if there was a private place they could go to talk. He also testified that Hill told him he did not want to talk about the investigation in front of Tyler. When Agent Bunch asked Hill where he wanted to talk in private, Hill led them out of the living room. The first bedroom, Agent Bunch said, was being searched and the second was full of exercise equipment, so the group ended up in Tyler's bedroom.

Agent Bunch testified he specifically told Hill he was not under arrest and that he did not have to answer questions. Agent Bunch also testified that he read Hill the *Miranda* warnings from the yellow "thirteen-alpha" card "just to be on the safe side," even though Hill was not under arrest. Agent Bunch had "no doubt" that he "absolutely" read Hill his *Miranda* rights, and that Hill then willingly agreed to talk.

Agent Bunch said he then "laid out some of [his] case" to Hill. Agent Bunch explained that the main information he wanted from Hill concerned another suspect in Tennessee. Agent Bunch said Hill cooperated and gave "specific and detailed information" about buying pills from the Tennessee suspect, including dates, quantities, and prices of pills, and multiple phone numbers for the Tennessee suspect. Agent Bunch said the entire conversation was "very cordial [and] polite," and that Hill was "a really nice guy about everything." Agent Bunch never raised his voice during the interview, nor did Hill. When asked about the DEA-6 report, Agent Bunch testified that it contained new information provided by Hill—mostly about the Tennessee suspect.

According to Agent Bunch, somebody shut the bedroom door "for privacy" and the door was shut most of the time. When asked whether an officer was always standing between Hill and the bedroom door, Agent Bunch explained that everybody in the room moved around during the conversation, and "probably sometimes" an officer stood in front of the door. Agent Bunch recalled the bedroom conversation as lasting between thirty and forty-five minutes. He did not recall Director Clark threatening to prosecute Tyler Hill, but Agent Bunch said law enforcement had "a lot of information on [Hill's] son," suggesting that the investigation of Tyler could have come up in the conversation.

The government's third and final witness was Robbie Clark, Director of the LCADTF. Director Clark recalled reading the search warrant to Hill in the living room. According to Director Clark's recollection, Agent Bunch asked Hill if there was somewhere private they could talk. Then, Hill led them into the bedroom and explained that he did not want his son to hear the conversation. Director Clark said an officer "could have been" standing between Hill and the door. Because Hill "led" the officers into the bedroom, Director Clark explained, Hill was

probably the one furthest from the door. Director Clark said all three officers were "in and out of the room" during the conversation that he remembered lasting about thirty minutes of a two-hour search. Director Clark recalled the bedroom door being closed most of the time.

Director Clark remembered Agent Bunch telling Hill that he was not under arrest and was not going to be arrested. Director Clark remembered Agent Bunch reading the *Miranda* warnings and said he remembered this specifically because Agent Bunch had trouble finding his card with the warnings printed on it. Director Clark said Hill was very cooperative and "very forthcoming" during the conversation, which he said lasted between twenty and thirty minutes. Hill was never handcuffed and never told he could not leave the bedroom. When asked whether he had threatened Hill will the federal prosecution of his son, Director Clark replied "no." Director Clark testified that Hill had told him he had been tipped off about the search warrant and that Hill had disposed of some pills before the officers arrived.

### III. Analysis

The parties' briefs focus mainly on whether Hill was in custody. Hill does not argue his statements were involuntary in the sense they were coerced against his will after receiving the *Miranda* warnings. Because the Court finds he was Mirandized, this omission dooms his motion.

First, the Court finds that Agent Bunch did read Hill his *Miranda* rights at the beginning of the interview in Tyler's bedroom. This finding, of course, rests on a credibility determination. As suggested by the Sixth Circuit, the Court details its reasoning behind this credibility determination. *See United States v. Cooke*, 915 F.2d 250, 252 (6th Cir. 1990). Hill's initial brief stated that he "did not recall" receiving *Miranda* warnings. D.E. 29-1 at 1. During his testimony, Hill said (1) he did not recall the warnings, (2) Agent Bunch "didn't read me my

rights," and (3) "I don't think he read them to me." Most of these statements leave open the possibility that Agent Bunch read the *Miranda* warnings, but Hill did not remember it. And, because this dispositive motion is premised on the lack of *Miranda* warnings, Hill is also a biased witness. *See Lockhart*, 2013 WL 1412338, at *4 (citing Sixth Circuit Pattern Jury Instruction 1.07, which directs jurors to consider whether the witness had "anything to gain or lose from the case"). In contrast, Agent Bunch testified he "absolutely" read Hill his *Miranda* rights, and had "no doubt" about it. Director Clark corroborated Agent Bunch's testimony, even remembering that Agent Bunch initially had trouble locating his "thirteen-alpha" card. The officers' testimony was more credible on this point, particularly because they were segregated under Federal Rule of Evidence 615.

Having received the *Miranda* warnings, it is clear that Hill voluntarily waived his rights when he proceeded to cooperate during the interview. Hill presented no evidence to contest the officers' testimony that he was a cooperative, cordial, and forthcoming interviewee. At most, Hill testified he failed to deny the criminal activity Bunch inquired about.

Having found that Hill received his *Miranda* warnings and voluntarily waived his rights, it is not necessary to determine whether Hill was in custody. But, for the sake of thoroughness (and in the event the District Judge finds no *Miranda* warnings were given), the Court also finds that Hill was not in custody when he was interviewed by three officers in two bedrooms of his home. Much of the testimony on this point centered on whether it was Hill's idea or the officers' idea to conduct the interview in Tyler's bedroom. According to the DEA-6 Report, Agent Bunch and Director Clark "asked HILL to come into his bedroom." D.E. 41-1 at 1. During their testimony, Agent Bunch and Director Clark did not recall exactly whose idea it was to move the conversation from the living room to a bedroom. Director Clark remembered Hill saying

something about not wanting his son to hear their conversation, but Hill denied making this statement.

Ultimately, it does not matter whose idea it was. Even assuming the officers directed Hill into Tyler's bedroom, that bedroom was not a custodial environment. Applying the factors from *United States v. Panak*, 552 F.3d 462, 465 (6th Cir. 2009), Hill did not experience "the functional equivalent of formal arrest," *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984), on the day his home was searched.

First, the location of the interview weighs heavily against a finding that Hill was in custody. "[A]n in-home encounter between the police and a citizen generally will be non-custodial." *Panak*, 522 F.3d at 466. And this case presents none of the factors that could elevate a home interview into a custodial interrogation. Hill was not handcuffed or manhandled, and the officers did not draw their weapons or even raise their voices. *See id*.

Second, the length and manner of the questioning do not favor a finding of custody. Hill testified the interview lasted an hour to an hour and a half or two hours. Agent Bunch recalled it lasting as long as forty-five minutes. Director Clark remembered the conversation lasting as long as thirty minutes. A time frame of two hours for the interview is not plausible because the entire search took two hours, and Hill described events during the search that took place before and after the interview. Even assuming the interview lasted an hour and a half, this length was not sufficiently onerous to transform a home interview into a custodial interrogation. *See, e.g.*, *Panak*, 552 F.3d at 467 (one-hour interview); *United States v. Mahan*, 190 F.3d 416, 423 (6th Cir. 1999) (finding an hour-and-a-half workplace interview to be non-custodial); *Gray*, 2014 WL 2873931, at *14 (finding a two-hour home interview to be non-custodial).

Furthermore, even though as many as fifteen officers were in the home, only three were present in the bedroom. This number would not have been unduly intimidating. And, even if Agent Bunch encouraged Hill to get himself a seat "toward the front of the bus," this encouragement to cooperate did not transform the situation into the functional equivalent of arrest. The same goes for Hill's recollection that Director Clark threatened to federally prosecute Hill's son if Hill did not cooperate. Director Clark denied making this threat, and Agent Bunch did not remember it. Assuming Director Clark made this statement, promises to recommend leniency or "speculation that cooperation will have a positive effect" do not amount to the sort of coercion that renders an interview custodial. *United States v. Delaney*, 443 F. App'x 122, 129 (6th Cir. 2011) (quoting *United States v. Guerrero,* 847 F.2d 1363, 1366 (9th Cir.1988)). Agent Bunch also testified that law enforcement had "a lot of information" on Tyler Hill's own drug trafficking activities. If an officer's threat to prosecute a third party is one that "could have been lawfully executed," it is not unduly coercive. *United States v. Hunter*, 332 F. App'x 285, 289 (6th Cir. 2009) (quoting *United States v. Johnson*, 351 F.3d 254, 263 (6th Cir. 2003)); *see also United States v. Miller*, 450 F.3d 270, 272 (7th Cir. 2006). Nothing in the record suggests that Hill's son could not be prosecuted. Accordingly, the manner of Hill's questioning was not unduly coercive.

The third factor is the extent of restraint on Hill's freedom of movement. Although Hill testified he felt like the officers would not have allowed him to leave the bedroom, the test under *Miranda* and *Panak* is an objective one. To determine whether a suspect was in custody, courts "focus on the 'objective circumstances of the interrogation' . . . to determine 'how a reasonable person'" in the suspect's place would gauge his freedom of movement. *Panak*, 552 F.3d at 465 (quoting *Stansbury*, 511 U.S. at 323, 325). Here, Hill was unhandcuffed in his own home.

12

Although the bedroom door was either shut (according to Agent Bunch and Director Clark) or had an officer standing in front of it (according to Hill), as courts have often found, a reasonable person in his own home, answering questions in an otherwise uncoercive atmosphere, would feel free to move around.  The evidence fails to set Hill's situation apart from other cases where courts in this District found that a police interview in the suspect's home or place of business was not custodial.  *See, e.g.*, *Solomon*, 2015 WL 5474395, at *5; *Roberts*, 2014 WL 2946650, at *3-6; *Gray*, 2014 WL 2873931, at *3; *Slone*, 2013 WL 3799419, at *4-5; *Lockhart*, 2013 WL 1412338, at *7.  This was not a case where the "inherently comfortable and familiar environment" of Hill's own home was transformed into an "unduly hostile, coercive and freedom-restraining" environment.  *Panak*, 522 F.3d at 466.

The fourth and final factor is whether the suspect was told he need not answer the officers' questions.  *Panak*, 522 F.3d at 465.  According to the DEA-6, Agent Bunch told Hill "he was not under arrest, he did not have to answer any questions if he did not want to and that he was not going to be arrested." D.E. 41-1 at 1.  Agent Bunch and Director Clark also testified that Hill was told he did not have to answer questions.  When the undersigned asked Hill whether an officer told him he did not have to answer questions, Hill answered, "no."  The Court finds that Hill is not credible on this point.  Hill is biased and the matching testimony from the government's separated witnesses contradicts him.  Thus, as Agent Bunch and Director Clark testified, Agent Bunch told Hill he did not have to answer questions.  This factor tips in favor of finding that Hill was not in custody.

Taking into account Hill's lack of credibility, none of the *Panak* factors weigh in favor of finding that Hill was in custody, *i.e.*, experiencing the functional equivalent of arrest, when

13

officers searched his home on February 5, 2014.  Even if he had been in custody, he received his *Miranda* warnings and waived them knowingly.

### IV.  Conclusion

Mr. Hill was not in custody.  He was given *Miranda* warnings and voluntarily waived his right to remain silent.  Either of these findings would lead to the conclusion that officers did not violate Hill's Fifth Amendment rights when they questioned him in his home.  The undersigned therefore **RECOMMENDS** that Hill's motion to suppress, D.E. 29, be **DENIED.**

The Court directs the parties to 28 U.S.C. § 636(b)(1) for appeal rights concerning this recommendation, issued under subsection (B) of that statute.  Pursuant to § 636(b)(1) and Federal Rule of Criminal Procedure 59(b), any party may serve and file written objections to any or all portions for de novo consideration by the District Court.  The parties should consult the aforementioned statute and rule for specific appeal rights and mechanics.  Failure to object in accordance with Rule 59(b) waives a party's right to review.

This the 8th day of October, 2015.

Signed By:
*Hanly A. Ingram*
United States Magistrate Judge